```
----------------------------------------------------------
            EXAMINATION UNDER OATH OF

                CALVIN LEAVELL

                JUNE 20, 2012
----------------------------------------------------------


APPEARANCES:

    FOR THE CHARTIS:
         BY:  MR. DUNCAN L. CLORE
         and MR. JEREMY BROWN
         STRASBURGER
         901 Main Street, Suite 4400
         Dallas, Texas  75202
         (214)651-4550

    FOR TESORO:
         BY:  MR. CRAIG J. de RECAT
         MANATT, PHELPS & PHILLIPS
         11355 W. Olympic Blvd
         Los Angeles, California  90064

    FOR CALVIN LEAVELL:
         BY:  MS. KALA S. DUMONT
         GAUL AND DUMONT
         924 Camaron
         San Antonio, Texas  78212
         (210)225-0685

    ALSO PRESENT:
         MR. MATT SCOTT (LWG Consulting),
         MR. DOUG MORRIS (LWG Consulting),
         and MS. JUDITH BLAKE (Chartis)

         CALVIN LEAVELL,
             The Witness; and

         OLGA GUTIERREZ,
             Certified Shorthand Reporter in
             and for the State of Texas
```

www.uslegalsupport.com
1-888-311-4240

5248a350-3be5-46c8-a2d2-18568454b761

EXHIBIT B

TES0000323-1

Page 54

1  I think she actually set the payments up and she worked
2  for Jack, named -- her name was -- I can't remember her
3  name.  When Jack wasn't there, you could generally find
4  her.
5      Q   All right.  At this point in time -- and we're
6  talking December of 2007, --
7      A   I know, yeah.
8      Q   -- did you have any concerns about the customer
9  and its ability to repay the moneys owed Tesoro?
10     A   Yes, I did.
11     Q   And what was the -- What were the nature of
12  those concerns?
13     A   The balance was too high.  They were not making
14  sufficient payments to reduce the balance.  They were --
15  They made a lot of promises and seemed to be working
16  toward those promises.  But then nothing would come up.
17  This was just kind of an ongoing process.
18         I felt like that even the -- even though
19  the account balance was high, very high -- I mean, I was
20  doing a lot of other things at the time, but the time I
21  could devote to this, I felt like they were working to
22  try to solve their problems, get new financing in, get
23  the account balance down.  And, you know, those promises
24  never came about.
25     Q   What was the customer telling you as to the

Page 55

1  reasons why they were not taking care of their account
2  balance?
3      A   The growing business volume.  They were growing
4  so fast that they couldn't get the money in fast enough.
5  And they were trying to expand their business with this
6  airline operation.  And that was going to supposedly
7  throw off a lot of cash to retire a balance.
8      Q   Okay.  Did there come a point where Tesoro
9  demanded collateral from EnMex?
10     A   We asked.  I don't know if "demand" is the
11  word.
12         We "requested".
13     Q   Did EnMex ever collateralize their account?
14     A   I thought they had, yes.
15     Q   And how did you believe, at the time, they had
16  collateralized their account?  Or at least partially
17  collateralized it, I guess?
18     A   There were two things:  They agreed to post a
19  letter of credit, verbally.  And they agreed to give us
20  a security agreement covering their assets.
21     Q   When you say "they", who were you --
22     A   Jack --
23     Q   -- referring to?
24     A   Jack Saryan.
25     Q   Jack Saryan.

Page 56

1          Was this -- was this in conversations with
2  you?
3      A   Yes.
4          I did two things.  I don't know if they
5  were real smart, but I had a security agreement prepared
6  that we had used for another account.  And I sent it to
7  Jack really as a -- I considered it a test of his
8  sincerity.  And also a placeholder while we could get a
9  more formalized security agreement in place that we
10  could negotiate with them.
11         And that came back.  And we -- And also,
12  sometime in that time frame, we received this letter of
13  credit, which turned out to be fraudulent.
14     Q   Okay.
15     A   And we went to work and held, I guess, two or
16  three meetings with Jack and Sam and their attorneys
17  with one of our local attorneys there in California.
18  And negotiated a more robust security agreement,
19  covering all assets that they had, whatever they were.
20     Q   All right.  Let me just -- let me just stop you
21  right there, if I may.
22         MR. CLORE:  I don't know about anybody
23  else, but would anyone like a break at all?
24         MS. DUMONT:  I'd love one.
25         MR. CLORE:  You'd love one?

Page 57

1          Why don't we -- why don't we go off the
2  record here, ma'am, for just a couple of minutes to give
3  everybody a chance to attend to other business.  And
4  then let's start up here in the next five or ten minutes
5  if that's all right.
6          (Off the record.)
7      Q   (BY MR. CLORE) All right.  We're back on the
8  record.
9          Sir, I believe when we took a break I was
10  asking you whether EnMex had ever collateralized or
11  partially collateralized this account.  And you were
12  explaining how you had thought at one point that they
13  had collateralized it.  You described a -- Begun to
14  describe some letters of credit and a security agreement
15  that was entered into, and then later an instrument that
16  I believe I've seen elsewhere referred to as a
17  modification and security agreement.  We'll go into that
18  in a little more detail in a few minutes.
19         Before we get into that, I want to go
20  back, if I may, and visit a little bit further on the
21  review function that you-all would regularly conduct of
22  accounts.  And you indicated that your outside auditors
23  were involved in that process.  And that the EnMex
24  account came on their radar screen and also yours in I
25  guess the last quarter of 2007, if memory serves.

15 (Pages 54 to 57)

EXHIBIT B

TES0000323-15

Page 62

```
 1    A   No.
 2    Q   Would there be a -- Would there be records that
 3  would show who set the credit limit for the EnMex
 4  account at various points in time?
 5    A   Somewhere.
 6    Q   What record would you look at -- want to look
 7  at to determine that?
 8    A   Well, that -- that report that you showed me
 9  would be one, I guess.  There was a -- There ought to be
10  a way within the -- what did they call it -- SAP, the
11  accounting system.  There was a credit management
12  feature that you or anybody could input a credit limit
13  into that credit management system.
14    Q   All right.  Let me just show you this document
15  once again.  You'll see on the front page it's got some
16  handwriting.
17    A   Yes.
18    Q   It looks like 10 million -- the abbreviation
19  for 10 million, --
20    A   Uh-huh.
21    Q   -- "SCL", which I assume are your initials?
22    A   Yes.
23    Q   And the date of 9/13 of '06?
24    A   Yes.
25    Q   Okay.  What would that do, would that indicate
```

Page 63

```
 1  that you set a $10 million credit limit on that date for
 2  this customer?
 3    A   Or approved one.  I didn't necessarily set it
 4  myself, but I said "That's okay."
 5    Q   Would there have been a separate credit limit
 6  for EnMex?  This is for Jetlux Petroleum.  Was there
 7  more than one account?
 8    A   I think that that was probably before they
 9  changed their name officially to EnMex.  So I think
10  there would be somewhere.
11    Q   Okay.  And this report, sir, that you just
12  looked at, would it have been placed in the credit file
13  for that customer?
14    A   Should have, yes.
15    Q   All right.  Going back to the subject of
16  collateralization of this account which has become a
17  problem by the last quarter of 2007, do you recall when
18  you first began discussing with Jack Saryan and
19  others -- or others at EnMex, the need to collateralize
20  the account or their account at Tesoro?
21    A   A time frame?
22    Q   Yes, sir.
23    A   Not specifically.  But it would have -- I would
24  think it would have been in the 2007/'8 time frame when
25  the balance started to grow, volume increase.
```

Page 64

```
 1    Q   Were there any requirements or guidelines
 2  within Tesoro that governed when an account needed to be
 3  collateralized?  In other words, how much open credit a
 4  customer could have before collateralization was needed?
 5    A   No.  Not that I'm aware of anyway.
 6    Q   Okay.  When you had these discussions with
 7  EnMex about the need for collateral, and you received
 8  their responses promising to provide collateral, but not
 9  following through, how would those communications
10  typically have taken place?  Did you communicate by
11  e-mail, telephone, face to face; do you recall how those
12  discussions took place?
13    A   Mostly by telephone.
14    Q   Mostly by telephone.
15        And I believe you had indicated that you
16  had visited EnMex's operations or their location several
17  times.
18    A   Not several times.  Maybe two -- twice that I
19  can recall.  And they -- they also came to San Antonio a
20  couple of times.
21    Q   Okay.  When did you first receive or believe
22  you had received a collateral instrument from EnMex
23  intended to secure this account?
24    A   I don't recall the date.  I don't recall when.
25    Q   Okay.
```

Page 65

```
 1    A   We -- I don't recall a specific date that we
 2  got what supposedly was a letter of credit.  I don't
 3  recall -- I recall sending them the -- I call it "the
 4  first security agreement", just to see that -- if it --
 5  what their response would be.  Because we always
 6  needed -- I mean, whatever -- I think the letter of
 7  credit was supposed to have been in the amount of 20 or
 8  $25 million.
 9    Q   Okay.
10    A   We need more -- I mean, we need all of the
11  collateral that we could get.
12    Q   Was the first letter of credit that you recall
13  ever having received the 24 -- I believe it was the
14  $24 million letter of credit?
15    A   I think it was.  It was something -- We only
16  got one that I know of.
17    Q   You only recall ever having received one letter
18  of credit from EnMex?
19    A   Yes, sir.  And then we had the -- I sent them
20  that first security agreement that I didn't have much
21  faith in, because it wasn't -- wasn't a clean document,
22  in my opinion.  Because we were --
23        And we got that back.  And then we had two
24  meetings with them with Tesoro's outside counsel in
25  Los Angeles that we had worked with, Wayne Hinson --
```

17 (Pages 62 to 65)

www.uslegalsupport.com
1-888-311-4240

5248a350-3be5-46c8-a2d2-18568454b761

EXHIBIT B

TES0000323-17

Page 66

1  "Hinson", something like that, and drew up another
2  agreement.
3      Q   Okay.
4      A   And then that in my view supplanted the ones
5  before.
6      Q   Okay.  Let's kind of go back.
7          The -- the letter of credit that you
8  recall having received, was that a letter of credit
9  drawn on Bank of America?  Do you recall?
10     A   I think it was, yes.
11     Q   Okay.  And did -- Was that letter of credit
12 ever called by Tesoro, to your knowledge?
13     A   Not to my knowledge.
14     Q   Okay.  How did -- Well, strike that.
15         What do you recall about that letter of
16 credit?  I mean, how did it come to be delivered to
17 Tesoro?
18     A   This has come up before.  I don't know how it
19 was delivered.  We -- we would -- Or I don't remember,
20 if I ever did know.
21         Letters of credit would come in several
22 different fashions.  They would -- And I'm talking about
23 from -- not just from EnMex, but from all customers.
24 They would come either by courier services:  Federal
25 Express, UPS, Express Mail, whatever.

Page 67

1          Some of them were faxed.  Some of them
2  came directly from the bank.  Some came telephonically.
3  They would send them -- send a copy by e-mail, and then
4  follow up with a hard copy generally.  Sometimes they
5  would come, not necessarily to us in the credit
6  department.  They would go to kind -- They would go to
7  the FedEx department.  They would go to the legal
8  department.  They would even go to the supply and
9  distribution department.  And then eventually make their
10 way back to us or a copy would make their way back to
11 us.
12     Q   All right.  What did Tesoro do with letters of
13 credit when they received them?  Were they maintained
14 somewhere?
15     A   They were maintained -- At one point in time
16 they were maintained in the le- -- in the finance
17 department.  Then they were also maintained in the
18 credit files.  We had a vault -- fireproof vault that we
19 put them in with other guaranteed documents and things
20 like that.
21     Q   Okay.  Now, the letter of credit that you
22 received from -- you believe you received from Tesoro --
23 excuse me -- from EnMex, my understanding is what --
24 what you had was a copy, not an original of a letter of
25 credit.

Page 68

1      A   If we had an original, I don't recall seeing
2  it.  I remember a copy being in the file, yes.
3      Q   Okay.  What did you do -- Well, do you recall
4  how -- Do you recall how you first became aware of the
5  letter of credit?
6      A   I had requested some kind of security, you
7  know, basically anything, letter of credit preferable,
8  real estate mortgage, whatever we could get from Jack
9  several times.
10         And I recall that it was -- It was either
11 in the file, one time when I went and pulled the file,
12 or it was in my what I call my inbox, my tray.  And I
13 think it was in the tray, in my inbox.  And I said, "Oh,
14 okay fine."  And I put it in the file.
15     Q   Okay.  Is it customary when you receive a
16 letter of credit to receive the original?
17     A   It was -- Eventually.  They didn't always come
18 at the same time.
19     Q   Okay.  But normally you would require the
20 original of the letter of credit, would you not?
21     A   Yes.
22     Q   Okay.  Did you ever receive the original of
23 this letter of credit?
24     A   Not that I ever saw.
25     Q   Did you ever take any steps to contact the

Page 69

1  institution -- issuing institution to verify the
2  authenticity of the letter of credit?
3      A   No.
4      Q   Why?
5      A   We didn't do that for any letters of credit.
6  As long as it was a named bank -- as long as it was a
7  well-known banking institution.
8      Q   Okay.
9      A   We just didn't -- didn't.
10     Q   Well, I mean -- But did you -- Would you not
11 have followed up to say, I mean, we never received the
12 original -- We need the original letter of credit?
13     A   I assumed that the original was in the vault,
14 that was our procedure.  If you got a letter of credit,
15 our clerical person, they were to make a copy, put it in
16 the credit file and put the original in the vault.
17     Q   Who maintained the -- Who maintained those
18 records?
19     A   Who -- I don't understand you.
20     Q   Okay.  Who was the custodian of those records?
21     A   I don't know if we ever had a designated
22 custodian.  We had a -- The -- Our clerical person who
23 would prepare, you know, guarantee documents, personal
24 guarantees, things like that, she was to have -- When
25 the original -- When the document was returned, her

18 (Pages 66 to 69)

5248a350-3be5-46c8-a2d2-18568454b761

EXHIBIT B

TES0000323-18

Page 126

1    Q   Okay.  What they've accused you of,
2  Mr. Leavell, I'm sure you'll appreciate, if it's true,
3  is very serious.
4    A   Sure.
5    Q   And I want to ask you, you've denied creating
6  these documents that they've indicated they believe you
7  created.  The institutions involved on the letters of
8  credit have denied these letters of credit are genuine.
9         Do you have any explanation to offer as to
10  how in the world these letters of credit came into
11  existence and who forged them?
12    A   No.  I do not have an explanation.  I do know
13  it was alleged that these -- And this is not come up
14  during this, so I'll bring it up -- that these documents
15  were created on my computer.  There were other people
16  that used my computer or could have used my computer.
17  Wouldn't have been a difficult thing to do.
18    Q   Well, that's not true of your home computer, is
19  it?
20    A   That's not true of my home computer.  I don't
21  understand that one.  Not at all.
22    Q   Okay.
23    A   Unless I sent one of these documents to myself
24  or somebody else sent it to me.  But, no, I don't
25  understand that at all.

Page 127

1    Q   Okay.  And do you have any explanation why you
2  would have ever had any of these letters of credit in
3  Word format on your home computer?
4    A   No.
5    Q   Okay.
6    A   Unless there was -- it was a sample of
7  something.  I might have done that -- done that in my
8  home computer for someone.
9    Q   Okay.  But you deny that you created these?
10    A   Yes.
11    Q   Okay.  Now, I'm not going to drag you through
12  all of the e-mails, because there are quite a few of
13  them.  But I'd like to show you a couple of e-mails that
14  we have found between you and the EnMex folks in 2008.
15  I want you to look at this e-mail, sir.
16         It's previously been marked Deposition
17  Exhibit 579 in another deposition.  It's got a Bates
18  TSOINSUSNU 15146.  Do you see that?
19    A   Yes.
20    Q   Okay.  This is, I believe, an e-mail in
21  January 15, 2008 from Lilit Hakimian to you.
22    A   Yes.
23    Q   Who is Lilit Hakimian?
24    A   Lilit was a lady that worked at EnMex.  And she
25  was kind of Jack's secretary/assistant, whatever you

Page 128

1  want to call her.  She -- More importantly she's the one
2  that sent the wire transfers from the bank.  That's why
3  I dealt with her.
4    Q   She was in their financial department
5  somewhere?
6    A   She worked for the company.  I don't know what
7  department she was in.
8    Q   Okay.  And you see this is actually a series of
9  e-mails between you and this lady.
10    A   Uh-huh.  Yes.
11    Q   I want you to look at the e-mail on the second
12  page, on the January 15, 2008 e-mail.
13    A   Okay.
14    Q   See where it says, "Thank you, Lilit.  The
15  second payment of 512,000 was not posted until last
16  night after I sent my message"?
17    A   Uh-huh.
18    Q   "I am in big trouble over the size and age of
19  your account" --
20    A   Uh-huh.
21    Q   -- substantial reduction very quickly.  It
22  sounds like you are working on it.  Please send whatever
23  money as soon as possible.  Also I need your audited
24  financials as soon as they are ready."
25         Were you in fact receiving criticism over

Page 129

1  the size and age of this account?
2    A   Not particularly.
3    Q   Okay.  But it clearly --
4    A   I mean, it was -- I was in big trouble because
5  they hadn't paid us.  Any time someone hadn't paid us, I
6  was in big trouble.
7    Q   As credit manager, that's kind of the way it
8  is, isn't it?
9    A   That's the way it worked.
10    Q   All right.  But you were -- Would it be a fair
11  statement you were pressing them --
12    A   Yes.
13    Q   -- to bring down this account balance?
14    A   Yes, sir, I was.
15    Q   Had you been requesting their audited
16  financials?
17    A   Probably had.
18    Q   Did they have audited financials?
19    A   They -- If we go back to that other memo where
20  we met with them, they mentioned they were getting their
21  audited financials ready.
22    Q   Uh-huh.
23    A   And that's probably what I was asking for.
24    Q   Did you ever --
25    A   We never got them.

33 (Pages 126 to 129)

www.uslegalsupport.com
1-888-311-4240

5248a350-3be5-46c8-a2d2-18568454b761

EXHIBIT B

TES0000323-33

Page 142

1    Q    Were you receiving any pressure from management
2  to sell product or -- you know --
3    A    Well, from our marketing management, yes.
4    Q    From marketing?
5    A    Management, per se.  But when Tesoro acquired
6  the Los Angeles refinery -- Everything was fine for a
7  while, but when the economy went to the south in that
8  area, it -- the pressure to move as much product as you
9  could began to mount.  And --
10   Q    Did your department receive calls from the
11 marketing folks?
12   A    Oh, yes.
13   Q    Were they -- Were they giving you any
14 difficulty?
15   A    Well, they always -- Their job was to sell as
16 much as possible.  I mean, it's a direct conflict there.
17   Q    Yeah.
18   A    But I mean, that's part of the game, I guess is
19 what I'm trying to say.
20   Q    Okay.  I've asked you a little bit about your
21 retirement.  Was that your decision?  I mean was that --
22   A    Yes.
23   Q    -- was that planned?
24   A    It was.
25   Q    You know, and I'm really not trying to invade

Page 143

1  anything personal.
2           THE WITNESS:  Should I say anything about
3  that, about my what drove my decision?
4           MS. DUMONT:  Not if you don't want to.
5    A    I really don't.
6    Q    (BY MR. CLORE) Okay.
7    A    I'll just say it this way:  I was getting very
8  tired.  And I was -- The stress level was very high.
9    Q    Did you ever feel you were being pressured into
10 retirement?
11   A    Oh, continuously -- Oh, no.  Pressure into
12 retiring?
13          No.  I just felt the pressure --
14   Q    You had a stress job?
15   A    I did.  Yes.
16   Q    Yeah, I understand, okay.
17          Did the EnMex account ever get to the
18 point where you felt like, you know, "I need to go talk
19 to my boss about this account and let him know about my
20 concerns and what we're trying to do and get his buy-in
21 or his advice on what we ought to be doing"?
22   A    I don't think I ever did that with any boss I
23 had at Tesoro, because most of them didn't want to know.
24   Q    Okay.
25   A    They didn't need another problem.

Page 144

1    Q    Understood.
2           Did anybody at Tesoro, other than the IT
3  folks, know your password?
4    A    Well, it's entirely possible.
5    Q    Why do you say that?
6    A    Because before my retirement -- My memory is
7  not as good as it used to be.
8    Q    Nor is mine.
9    A    And we had a lot of passwords.  So I wrote them
10 all down on a piece of paper and stuck them up on my
11 cubicle wall.
12   Q    Okay.
13   A    And I was told -- People said, "That's not a
14 good idea."  But I had so much stuff to do, I needed
15 them there.
16          MR. CLORE:  Okay.  Sir, I want to thank
17 you for your time.  I realize this was an imposition.
18 If I need anything further, I'll go through your
19 attorney.  But once again, I want to thank you for your
20 time.
21          Just so you'll know, you've probably been
22 through this drill.  But the court reporter will
23 transcribe your testimony.  We'll send a transcript to
24 your lawyer.  And she'll forward it on to you for
25 review.  We'd ask that you review it, if you would,

Page 145

1  please.  And if -- You know, if there are typos, or we
2  got a word wrong here or there, if you'll correct those
3  and send it back to your lawyer, we'd appreciate it.
4           THE WITNESS:  Okay.
5           MR. CLORE:  Thank you very much.  This
6  concludes your examination.
7           THE WITNESS:  Thank you.
8           THE REPORTER:  Going off the record at
9  2:58 p.m.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

37 (Pages 142 to 145)

5248a350-3be5-46c8-a2d2-18568454b761

EXHIBIT B

TES0000323-37

**Page 146**

CHANGES AND SIGNATURE
WITNESS: CALVIN LEAVELL      DEPO DATE: JUNE 20, 2012
PAGE   LINE      CHANGE         REASON

I, CALVIN LEAVELL, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
CALVIN LEAVELL

**Page 147**

THE STATE OF TEXAS )

COUNTY OF BEXAR)

Before me, _____, on this day personally appeared CALVIN LEAVELL, known to me (or proved to me under oath or through _____) (description or identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2012.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

* * * * * * * *

**Page 148**

CERTIFICATE FROM THE EXAMINATION UNDER OATH OF CALVIN LEAVELL
June 20, 2012

I, OLGA GUTIERREZ, a Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the foregoing Examination Under Oath of CALVIN LEAVELL, the Witness, hereinbefore named was at the time named, taken by me in stenograph on June 20, 2012, the said Witness having been by me first duly cautioned, and sworn to tell the truth, the whole truth, and nothing but the truth, and later transcribed from stenograph into typewriting under my direction, and that the charge for the completed examination under oath is _____ due from MR. DUNCAN CLORE(CHARTIS); Certified to by me this ____ day of _____, 2012.

_____
OLGA GUTIERREZ, Texas CSR 5061
Expiration Date: 12/31/13
U.S. Legal Support, Inc.
Firm Registration No. 341
4801 N.W. Loop 410, Suite 375
San Antonio, Texas  78229
(210)734-7127

38 (Pages 146 to 148)

www.uslegalsupport.com
1-888-311-4240

5248a350-3be5-46c8-a2d2-18568454b761

EXHIBIT B

TES0000323-38