UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| TESORO REFINING & | § | Cv. No. SA:13-CV-931-DAE |
| MARKETING COMPANY LLC, | § | |
| | § | |
|     Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| NATIONAL UNION FIRE | § | |
| INSURANCE COMPANY OF | § | |
| PITTSBURGH, PENNSYLVANIA, | § | |
| | § | |
|     Defendant. | § | |

ORDER (1) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT; (2) GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT, AND (3) DENYING AS MOOT DEFENDANT'S MOTION, IN
THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

Currently before the Court is a Motion for Partial Summary Judgment

filed by Plaintiff Tesoro Refining & Marketing Company LLC ("Plaintiff" or

"Tesoro") (Dkt. # 150).  Also before the Court is a Motion for Summary Judgment

filed by Defendant National Union Fire Insurance Company of Pittsburgh,

Pennsylvania ("Defendant") (Dkt. # 151).  Defendant has also filed a Motion, in

the Alternative, for Partial Summary Judgment (Dkt. # 153) directed only at

Plaintiff's bad faith and punitive damages claims.  The Court held a hearing on the

motions on April 1, 2015.  At the hearing, Craig J. de Recat, Esq., and Emil

Petrossian, Esq., represented Plaintiff, and Kirsten Spira, Esq., represented

1

Defendant.  After careful consideration of the supporting and opposing memoranda and the arguments presented at the hearing, the Court, for the reasons that follow, **DENIES** Plaintiff's Motion for Partial Summary Judgment, **GRANTS** Defendant's Motion for Summary Judgment, and **DENIES AS MOOT** Defendant's Motion, in the Alternative, for Partial Summary Judgment.

BACKGROUND

This case arises out of a dispute over a commercial crime insurance policy purchased by Plaintiff from Defendant.  Plaintiff is an independent refiner and marketer of petroleum products organized as a Delaware limited liability company.  (Ex. 7, Dkt. # 151-2 ¶ 3; Dkt. # 1 ¶ 1.)  Plaintiff's principal place of business is in San Antonio, Texas.  (Dkt. # 1 ¶ 1.)  Defendant is an insurer incorporated in Pennsylvania with a principal place of business in New York, New York.  (Id. ¶ 2.)

In 2003, Plaintiff began selling fuel to Enmex Corp. ("Enmex"), a petroleum distributor, on credit.[1]  (Dkt. # 194 ¶ 12.)  Calvin Leavell ("Leavell"), as the manager of Plaintiff's credit department, was responsible for managing Enmex's credit account with Plaintiff.  (Ex. F, Dkt. # 150-2 at 167; Ex. G, Dkt. # 150-2 at 16.)  By December 2007, Enmex's credit balance had grown to

---

[1] Enmex is also referred to in the evidentiary materials as "Jetlux" and "TransEnergy."  The parties agree that the different names refer to a single entity, and the Court will therefore refer to it as "Enmex," as do the parties.

approximately $45 million, and Leavell had become concerned about Enmex's ability to pay down this outstanding debt.  (Dkt. # 194 ¶ 16; Ex. E, Dkt. # 150-2 at 54–55.)

In late 2007, Plaintiff's auditor Deloitte & Touche ("Deloitte"), as part of its year-end review, conferred with Leavell concerning Enmex's outstanding credit balance.  (Ex. N, Dkt. # 150-2; Ex. O, Dkt. # 150-2.)  On December 13, 2007, Bethany Eggleston ("Eggleston"), a Deloitte auditor, emailed Leavell requesting additional information about the Enmex account.  (Ex. O, Dkt. # 150-2 at 1.)  In response, Leavell represented that the Enmex account was secured by a $12 million letter of credit.  (Ex. O, Dkt. # 150-2 at 1; Ex. P, Dkt. # 150-2 at 1.)  Eggleston requested documentation of the letter of credit on December 14, 2007.  (Ex. O, Dkt. # 150-2 at 1.)  On December 17, 2007, a document purporting to be a $12 million letter of credit was created in the part of Tesoro's server that stored Leavell's documents, which was password protected.[2]  (Ex. Q, Dkt. # 150-3 at 2–3;

---

[2] Defendant has objected to Plaintiff's Exhibit Q, a report by a forensic consultant on its investigation of Leavell's computer files, on the basis that the report's conclusions that Leavell created the falsified letters of credit and security agreement are inadmissible hearsay.  (Dkt. # 175-36; Dkt. # 194 at 1.)  Plaintiff has offered these out-of-court statements as evidence to prove that Leavell created the documents, and the statements are therefore inadmissible hearsay.  See Fed. R. Evid. 801.  Plaintiff's argument that the report simply summarizes metadata does not apply to the report's conclusions.  Plaintiff further has not shown that it could present the statements in a form that would be admissible at trial.  See Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment ("The burden is on the proponent to show that the material is admissible as presented or to explain the

Ex. R, Dkt. # 150-3 at 1, 4–6.)  On December 18, Deloitte noted that the Enmex

account was secured by a $12 million letter of credit and that lack of a credit

reserve for the account appeared appropriate.  (Ex. T, Dkt. # 150-4 at 59.)

On January 16, 2008, Tesoro consultant Christine McGhee emailed

Leavell inquiring into Enmex's past due balances.  (Ex. U, Dkt. # 150-4 at 2.)  On

January 17, 2008, a document purporting to be a modification of the $12 million

letter of credit, increasing its value to $24 million, was created in the part of

Tesoro's server that stored Leavell's documents, which was password protected.

(Ex. Q, Dkt. # 150-3 at 3–5; Ex. R, Dkt. # 150-3 at 1, 6–7.)  On February 4, 2008,

in response to a request from Eggleston, Leavell provided Eggleston with a copy of

the modified $24 million letter of credit.  (Ex. W, Dkt. # 150-4 at 2.)  On February

13, Leavell forwarded an email to Phil Anderson, Plaintiff's treasurer, and Otto

Schwethelm, Plaintiff's CFO, that included discussion of the $24 million letter of

credit, leading Schwethelm to believe Enmex was below its credit limit.  (Ex. H,

Dkt. # 150-2 at 1–3.)

---

admissible form that is anticipated.").  Defendant's objection is therefore
**SUSTAINED**.
       Defendant does not dispute, however, the forensic evidence contained
in the report, which shows that the letters of credit and a security agreement were
created in the portion of Tesoro's server storing Leavell's documents, which was
password protected.  (Dkt. # 194 ¶¶ 20, 26, 51, 52.)  The Court will therefore
consider the forensic evidence summarized in the report, but will not consider the
report's conclusions that Leavell in fact created the documents.

By March 30, 2008, Enmex's outstanding credit balance had reached approximately $59 million.  (Dkt. # 194 ¶ 39.)  In April 2008, in connection with its quarterly review, Ernst & Young, Plaintiff's new auditor, had meetings with Leavell and other Tesoro employees in which Enmex's outstanding balance was discussed.  (Ex. AA, Dkt. # 150-4 at 1–2; Ex. L, Dkt. # 150-2 at 17.)  On May 1, 2008, a document purporting to be a security agreement executed by Enmex in favor of Plaintiff on January 25, 2008, was created in the part of Tesoro's server that stored Leavell's documents, which was password protected.  (Ex. Q, Dkt. # 150-3 at 5–6; Ex. R, Dkt. # 150-3 at 1, 7–8.)  Ernst & Young noted the existence of the modified letter of credit and security agreement in its quarterly review update.  (Ex. Z, Dkt. # 150-4.)

As of September 30, 2008, the Enmex account balance had reached $88.9 million.  (Dkt. # 194 ¶ 50.)  On October 13, 2008, a document purporting to be a new $24 million letter of credit was created in the part of Tesoro's server that stored Leavell's documents, which was password protected.  (Id. ¶ 51.)  Leavell emailed Plantiff's CFO on October 20, 2008, representing that Tesoro held a $24 million letter of credit.  (Ex. DD, Dkt. # 150-4.)  A PDF version of the document, with the addition of a Bank of America logo and signature block, was created on October 23, 2008, in the Credit Department's file share folder.  (Dkt. # 194 ¶ 52.)

In December 2008, Plaintiff presented the $24 million letter of credit to Bank of America and was informed that it was not valid.  (Ex. 22, Dkt. # 151-6; Ex. 23, Dkt. # 151-6.)  Plaintiff subsequently stopped selling fuel to Enmex, and brought suit against Enmex for breach of contract in January 2009.  (Ex. 27, Dkt. # 151-8 at 1.)  While the forensic evidence showing the creation of the letters of credit and security agreement suggests that Leavell created the documents and forged the signatures appearing on them, Leavell testified that he neither created the documents nor forged their signatures.  (Dkt. # 175-2 at 48:11–15, 88:1–4, 116:8–19, 145:5–20.)

Plaintiff submitted an initial insurance claim under Paragraph A.2 of its policy with Defendant, covering certain losses due to forgery or alteration, in August 2009.  (Ex. 33, Dkt. #151-11 at 1.)  Defendant issued a preliminary denial of Plaintiff's claim on November 20, 2009, and a final denial on May 13, 2011. (Id.)  In January 2011, Plaintiff submitted an amended claim under Paragraph A.1 of its policy, covering certain losses due to employee theft.  (Ex. B, Dkt. # 150-2; Dkt. # 194 ¶ 2.)  Defendant denied Plaintiff's claim on April 10, 2013.  (Ex. C, Dkt. # 150-2 at 1.)

On May 6, 2013, Plaintiff filed suit against Defendant in the District Court for the Central District of California for breach of contract and breach of the implied covenant of good faith and fair dealing.  (Dkt. # 1 at 8–11.)  Plaintiff seeks

6

declaratory relief, actual damages, and exemplary and punitive damages.  (Id. at

11.)  The action was transferred to this Court on October 9, 2013.  (Dkt. # 38.)

Plaintiff filed its Motion for Partial Summary Judgment on November

13, 2014.  (Dkt. # 150.)  Defendant filed a Response on December 8, 2014 (Dkt.

# 175), and Plaintiff filed a Reply on December 22, 2014 (Dkt. # 185).  Defendant

filed its Motion for Summary Judgment (Dkt. # 151) and its Motion, in the

Alternative, for Partial Summary Judgment (Dkt. # 153) on November 13, 2014.

Plaintiff filed a Response to each on December 8, 2014 (Dkt. ## 177, 178), and

Defendant filed its Replies on December 22, 2014 (Dkt. ## 183, 184).

## LEGAL STANDARD

A court must grant summary judgment when "the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Meadaa v. K.A.P.

Enterprises, L.L.C., 756 F.3d 875, 880 (5th Cir. 2014).  "Substantive law will

identify which facts are material."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986).  A dispute is only genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  Id.

In seeking summary judgment, the moving party bears the initial

burden of demonstrating the absence of a genuine issue of material fact.  Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this burden,

the nonmoving party must come forward with specific facts that establish the existence of a genuine issue for trial. Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (internal quotation marks omitted).

In deciding whether a fact issue has been created, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Kevin M. Ehringer Enters. v. McData Servs. Corp., 646 F.3d 321, 326 (5th Cir. 2011) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

## DISCUSSION

Defendant has moved for summary judgment on all of Plaintiff's claims, arguing that Plaintiff has failed to show that its loss was covered under its insurance policy with Defendant. (Dkt. # 151 at 10.) Defendant specifically

argues that Leavell's conduct was not a "theft" covered under the policy, and that the loss alleged by Plaintiff did not "result directly from" Leavell's conduct.  (Id. at 11, 15.)  Plaintiff has concurrently filed for partial summary judgment, seeking judgment on the issues of the proper interpretation of "theft" under the policy and whether Leavell's conduct was covered under the policy.  (Dkt. # 150 at 1.) Because the issues and arguments raised in Plaintiff's Motion for Partial Summary Judgment overlap substantially with those raised in Defendant's Motion for Summary Judgment, the Court will address them together.

The parties agree that Texas law governs the interpretation of the insurance policy at issue here.  "In general, an insured bears the initial burden of showing that there is coverage under an insurance policy . . . ."  Venture Encoding Serv., Inc. v. Atl. Mut. Ins. Co., 107 S.W.3d 729, 733 (Tex. App. 2003).  Texas courts interpret insurance policies according to the rules of contract construction. Am. Mfrs. Mut. Ins. Co. v. Schaefer, 124 S.W.3d 154, 157 (Tex. 2003).  Courts give policy language "its ordinary and generally accepted meaning unless the policy shows that the words used are intended to impart a technical or different meaning."  Id. at 158.  "If policy language is worded so that it can be given a definite or certain legal meaning, it is not ambiguous and we construe it as a matter of law."  Id. at 157.  Disagreement over the proper interpretation of contract

language does not render it ambiguous—contract language is ambiguous only if it is susceptible to two or more reasonable interpretations.  Id.

"If a policy provision is ambiguous, the court must adopt the insured's construction of the provision, 'as long as that construction is not unreasonable, even if the construction urged by the insurer appears more reasonable or a more accurate reflection of the parties' intent.'"  Lubbock Cnty. Hosp. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 143 F.3d 239, 242 (5th Cir. 1998) (quoting Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co., 811 S.W.2d 552, 555 (Tex. 1991)).  The rules favoring the insured are only applicable where the policy language is ambiguous.  Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Kasler Corp., 906 F.2d 196, 198 (5th Cir. 1990)  If the term in question is susceptible of only one reasonable interpretation, the court must enforce the provision as written.  Id.; Lubbock Cnty. Hosp. Dist., 143 F.3d at 242.

I.    Interpretation of "Employee Theft"

The resolution of Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment both depend on the interpretation of the employee "theft" covered by the policy.  Paragraph A.1 of the policy provides:

1.  Employee Theft

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an

"employee", whether identified or not, acting alone or in collusion
with other persons.  For the purposes of this Insuring Agreement,
"theft" shall also include forgery.

("Policy," Ex. 6, Dkt. # 151-2 ¶ A.1.)  "Theft" is defined under the policy as "the

unlawful taking of property to the deprivation of the insured."  (Id. ¶ F.20.)

    A.    <u>Whether "Employee Theft" Includes Loss Resulting from Forgery</u>

The parties first disagree as to how forgery fits into the definition of

"theft."  According to Defendant, the inclusion of forgery in the definition of

"theft" in Paragraph A.1 provides for coverage of an employee's unlawful taking

by means of forgery.  (Dkt. # 151 at 12.)  Defendant argues that the language does

not cover, however, a loss caused by an employee's forgery that does not qualify

as a "theft"—an "unlawful taking of property to the deprivation of the insured"

committed by an employee.  (Id.; Dkt. # 183 at 3–4.)  Plaintiff argues that the

statement "'theft' shall also include forgery" means instead that forgery is one

form of the broader category of theft that may give rise to coverage under the

policy, "such that a forgery always constitutes theft."  (Dkt. # 177 at 3.)  As a

result, Plaintiff argues, the policy covers any loss directly caused by an employee's

forgery.  (Id. at 4.)

The Court finds that the language of Paragraph A.1 is unambiguous,

and that the provision covers losses resulting from unlawful takings by employees

by means of forgery, not any loss resulting from an employee's forgery.  Paragraph

A.1, as indicated by its title, covers losses resulting from "Employee Theft."  Using the definition of "theft" set out in Paragraph F.20, the last sentence of Paragraph A.1 reads, "For the purposes of this Insuring Agreement, the unlawful taking of property to the deprivation of the insured shall also include forgery."  (See Policy ¶¶ A.1, F.20.)  An act of forgery, however, does not require that a taking occur.[3] See (Policy ¶ F.7); Tex. Pen. Code § 32.21.  It would be incongruous to interpret the sentence's use of "include" to place forgery in the same class or category as an unlawful taking, as urged by Plaintiff, such that an act requiring no taking would suffice to show the unlawful taking required for coverage.  Plaintiff's interpretation—that "a forgery always constitutes a theft" under the policy— suggests that language explaining the scope of a covered "unlawful taking" creates a basis for coverage separate and independent from an unlawful taking.  The Court finds this interpretation unreasonable.

Instead, the statement that "'theft' shall include forgery" must be read to provide that "forgery" is one possible means of effectuating an unlawful taking that would be covered under the policy.  "[A] court construing a contract must read that contract in a manner that confers meaning to all of its terms, rendering the contract's terms consistent with one another."  Tittle v. Enron Corp., 463 F.3d 410, 419 (5th Cir. 2006).  First, the definition of "theft" set out in Paragraph F.20 does

---

[3] The parties disagree as to whether "forgery" as used in Paragraph A.1 is defined by the policy or by Texas law.  The dispute is not relevant to the analysis here.

not include "forgery," suggesting that the inclusion of "forgery" in Paragraph A.1 was not intended to expand or otherwise alter the meaning of "theft" as specifically defined under the policy.  (See Policy ¶ F.20.)

Second, loss resulting from forgery by employees is excluded from the policy's coverage under Paragraph A.2, which covers loss resulting from forgery of commercial paper "made or drawn by or drawn upon" the insured.  (See id. ¶¶ A.2, D.1.c.)  If, as Plaintiff argues, the substantive definition of "forgery" is the same for both paragraphs, interpreting Paragraph A.1 to mean that a loss resulting from forgery committed by an employee is covered even absent an unlawful taking would render the exclusion of employee forgery from Paragraph A.2 superfluous.  The exclusion expressly states that losses resulting from an employee's bad acts must satisfy the requirements of Paragraph A.1.  (Id. ¶ D.1.c.) A loss due to forgery that would otherwise be covered under Paragraph A.2, when committed by an employee, must qualify under the distinct requirements of Paragraph A.1—namely, that the loss result from an unlawful taking committed by an employee.  (See id. & ¶ A.1).

Courts may also refer to extrinsic evidence to determine the commonly understood meaning of an industry term.[4]  Mescalero Energy, Inc. v.

---

[4] For this reason, Plaintiff's objection to the declaration of Robert Brignanti, submitted by Defendant as an expert witness to support its interpretation of the term "theft" in the policy, is **OVERRULED**.  See also Nat'l Union Fire Ins. Co. of

Underwriters Indem. Gen. Agency, 56 S.W.3d 313, 323 (Tex. App. 2001) (citing

Amarillo Oil Co. v. Energy-Agri Prods., Inc., 794 S.W.2d 20, 22–25 (Tex. 1990)).

Both parties cite an "industry circular" issued by Insurance Services Office, Inc.

("ISO"), a company that provides policy language for insurance products

(including the one at issue here), as supportive of their definitions of "theft."

Neither party, however, has provided the Court with the section of the ISO's

commentary that applies to the form used in the policy here—the Commercial

Crime Policy (Loss Sustained Form).  The Court will therefore not consider the

ISO's commentary in interpreting the policy.

  Plaintiff argues that its position is corroborated by Defendant's own

statement, in its April 10, 2013 letter denying coverage, that Tesoro could establish

coverage either by showing "(1) that its loss directly resulted from Leavell's

'theft' . . . or (2) that its loss directly resulted from Leavell's forgery . . . ."  (Dkt.

# 177 at 5; Ex. C, Dkt. # 150-2 at 4.)  "If the contract language is not fairly

susceptible of more than one legal meaning or construction . . . extrinsic evidence

is inadmissible to contradict or vary the meaning of the explicit language of the

parties' written agreement."  Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI

Pittsburgh, Pa. v. CBI Indus., Inc., 907 S.W.2d 517, 521 & n.6 (Tex. 1995)
("Extrinsic evidence may, indeed, be admissible to give the words of a contract a
meaning consistent with that to which they are reasonably susceptible, i.e., to
'interpret' contractual terms.").  The Court does not, however, find it necessary to
refer to the Brignanti declaration to aid its interpretation of the policy, which the
Court finds to be clear and unambiguous on its face.

14

Indus., Inc., 907 S.W.2d 517, 521 (Tex. 1995).  Even if the Court were to find that

the language of the policy is ambiguous, rendering the denial letter admissible to

establish the parties' intent, the letter does not alter the Court's finding, stated

above, that Plaintiff's interpretation of "theft" to include a forgery independent of

an unlawful taking is unreasonable.  In light of the language of Paragraph A.1, the

definition of "theft" set out in Paragraph F.20, and Paragraph D.1.c's exclusion of

employee forgery from coverage under Paragraph A.2, the policy, considered as a

whole, cannot reasonably be interpreted to cover a loss resulting from forgery

committed by an employee except where such forgery was used to effect an

unlawful taking.

      B.     <u>Whether the Claimed Loss is an Unlawful Taking</u>

      The parties further disagree as to the correct construction of "unlawful

taking."  Plaintiff argues that because "unlawful taking" is undefined in the policy,

the Court should ascertain its plain meaning by looking to its usage under Texas

law, and defines the term with reference to the sections of the Texas Penal Code

defining theft.  (Dkt. # 177 at 7; Dkt. # 150 at 8.)  Defendant does not offer its own

definition, but appears to argue that "unlawful taking" is not susceptible to more

than one reasonable interpretation and thus should be given its plain, ordinary

meaning.  (Dkt. # 151 at 13–15; Dkt. # 183 at 4.)  The Court has found no Texas

precedent interpreting "unlawful taking" in the context of a commercial crime

insurance policy, and will therefore look to Texas's general principles of contract interpretation in order to determine, "as best it can, what the highest court of the state would decide." Barfield v. Madison Cnty., Miss., 212 F.3d 269, 272 (5th Cir. 2000); see also Lynch Props., Inc. v. Potomac Ins. Co. of Ill., 962 F. Supp. 956, 959–60 (N.D. Tex. 1996).

Here, the policy defines "theft" as "the unlawful taking of property to the deprivation of the insured." (Policy ¶ F.20.) The term "unlawful taking" is not defined in the policy. The Oxford English Dictionary defines "taking" as "[t]he physical act of possessing oneself of anything," with reference to the verb "take," meaning "to transfer to oneself by one's own physical act." Oxford English Dictionary Vol. XVII, 576 (2d ed. 1989). Black's Law Dictionary defines a "taking" as "[t]he act of seizing an article, with or without removing it, but with an implicit transfer of possession or control." Black's Law Dictionary 1682 (2014). This definition does not require physical possession of the seized article, but does require, at minimum, that the actor exert control over the article such that possession or control is transferred.

The term unlawful, of course, requires reference to Texas law. The acts relevant to the analysis here are conversion and theft. Texas defines the tort of conversion as "the wrongful assumption and exercise of dominion and control over the personal property of another to the exclusion of or inconsistent with the owner's

rights." <u>Burns v. Rochon</u>, 190 S.W.3d 263, 267–68 (Tex. App. 2006) (citing

<u>Waisath v. Lack's Stores, Inc.</u>, 474 S.W.2d 444, 447 (Tex. 1971)).  Conversion

requires a showing that a person "unlawfully and without authorization assumed

and exercised control over the property to the exclusion of, or inconsistent with,

the plaintiff's rights as owner."  <u>Action Towing, Inc. v. Mint Leasing, Inc.</u>, 451

S.W.3d 525, 530 (Tex. App. 2014).  The crime of theft is defined as the

"unlawful[] appropriat[ion of] property with intent to deprive the owner of

property."  Tex. Penal Code § 31.03(a).  "Appropriation of property is unlawful if

it is without the owner's effective consent."  <u>Id.</u> § 31.03(b)(1).  Combining these

rules, the Court finds that "unlawful" in the context of a taking means "without the

owner's authorization or consent."[5]

       In consideration of these definitions and standards, the Court finds

that the plain meaning of "unlawful taking" under Texas law is the act of seizing or

otherwise exercising control over an article such that possession or control of the

article is transferred without the owner's authorization or consent.  The evidence

here, taken in the light most favorable to Plaintiff, does not establish a dispute of

---

[5] The Court recognizes that conversion and theft require different mental states
under Texas law.  Conversion includes no intent requirement; acting with good
faith or innocence is not a defense to conversion.  <u>Henson v. Reddin</u>, 358 S.W.3d
428, 435 (Tex. App. 2012).  For theft, one must have "intent to deprive the owner
of property."  Tex. Penal Code § 31.03(a).  Because it is not necessary to the
resolution of the issues here, the Court offers no opinion on whether an "unlawful
taking" under the policy requires a specific mental state.

material fact as to whether Leavell's acts constituted an unlawful taking under this definition.  From 2003 through 2008, Plaintiff sold fuel to Enmex on credit.  (Dkt. # 150–1 ¶ 12.)  Leavell was responsible for managing Enmex's credit account, (Ex. F, Dkt. # 150-2 at 167; Ex. G, Dkt. # 150-2 at 16), and forged letters of credit and a security agreement that misrepresented the amount of collateral held by Plaintiff, (Ex. Q, Dkt. # 150-3; Ex. R, Dkt. # 150-3).[6]  Believing the account to be adequately collateralized, Plaintiff continued selling fuel to Enmex on credit, resulting in a loss of approximately $90 million when Enmex ultimately failed to pay its debts.  (Ex. H, Dkt. # 150-2 at 1–3; Dkt. # 150-1 ¶ 50.)

Plaintiff argues that its fuel was unlawfully taken by Leavell, and claims coverage under the policy for the loss of its fuel.[7]  (See Dkt. # 177 at 1; Dkt.

---

[6] The Court notes that Leavell's testimony that he did not create the documents in question or forge the signatures appearing on the documents is sufficient to create a genuine dispute of fact as to whether Leavell forged the documents for the purpose of Plaintiff's Motion for Summary Judgment.  The forensic evidence, while highly suggestive, is circumstantial, and Leavell's direct testimony is thus sufficient to dispute his alleged forgeries when the evidence is viewed in the light most favorable to Defendant as the nonmoving party.  The dispute is not material here, however, because as explained below, even if Leavell did falsify and forge the documents, as argued by Plaintiff, his misrepresentations would not constitute an "unlawful taking" as a matter of law.

[7] The Court notes that Plaintiff's loss was not in fact the "loss" of its fuel, but the loss sustained when Enmex failed to pay for the fuel it had purchased on credit. While the record is unclear as to the exact nature of the sales transactions, Plaintiff at minimum received enforceable promises of future payment in consideration for the fuel sold to Enmex.  Plaintiff incurred a loss only when it was unable to collect on Enmex's debt.  See Beach Cmty. Bank v. St. Paul Mercury Ins. Co., 635 F.3d 1190, 1195 (11th Cir. 2011) (holding that the measure of the insured's loss "is

18

# 150 at 7.)  There is no evidence, however, that Leavell at any time seized or

otherwise exercised control over the fuel sold by Plaintiff such that control or

possession of the fuel was transferred.  The transfer of fuel to Enmex was made

pursuant to Plaintiff's sale of fuel to Enmex on credit.  Even if Plaintiff relied on

Leavell's misrepresentations that the account was adequately collateralized in

selling the fuel on credit, Leavell's misrepresentations were not acts whereby

Leavell seized, took possession, or otherwise exercised control over Plaintiff's fuel

such that Plaintiff was deprived of control or possession.

Plaintiff argues that the Court should look to the definition of criminal

theft provided for under Texas Penal Code §§ 31.03 & 31.01 to inform its

interpretation of "taking."   (Dkt. # 177 at 7.)  Plaintiff asserts that "the Court must

ascertain that term's plain meaning by examining its usage under Texas law,"

citing a decision out of the Northern District of Texas.  (Id.)  The district court's

opinion in that case states, "[t]o ascertain the plain meaning of a term, the Court

looks to the term's usage under Texas law."  Tolar v. Allstate Tex. Lloyd's Co.,

772 F. Supp. 2d 825, 830 (N.D. Tex. 2011).  The Texas case used to support the

district court's assertion, however, involves statutory interpretation, not the

based on the amount of credit extended"); First State Bank of Monticello v. Ohio
Cas. Ins. Co., 555 F.3d 564, 569 (7th Cir. 2009) (holding that the insured
experienced an actual loss when the checks exchanged for the insured's money
orders were not honored); F.D.I.C. v. United Pac. Ins. Co., 20 F.3d 1070, 1080
(10th Cir. 1994) ("The measure of damage of the actual loss regarding a loan is the
outstanding balance due on the loan.").

interpretation of a contract.  See Tenaska Frontier Partners, Ltd. v. Sullivan, 273

S.W.3d 734, 737 (Tex. App. 2008).  The Supreme Court of Texas has clearly

stated that insurance policy terms "are given their ordinary and commonly

understood meaning unless the policy itself shows the parties intended a different,

technical meaning."  Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co., 267 S.W.3d

20, 23 (Tex. 2008).

        The Court does not completely reject the assertion that Texas law may

inform the "ordinary and commonly understood meaning" of policy terms,

particularly in a commercial "crime" policy insuring against employee "theft."

The definition of criminal theft under Texas law, however, is too broad to inform

the interpretation of "theft" in the criminal crime policy here, which defines "theft"

as an "unlawful taking of property to the deprivation of the insured."  (Policy

¶ F.20.)  Theft, as defined in Texas Penal Code § 31.03, encompasses the

previously separate offenses of theft, theft by false pretext, conversion by a bailee,

theft from the person, shoplifting, acquisition of property by threat, swindling,

swindling by worthless check, embezzlement, extortion, receiving or concealing

embezzled property, and receiving or concealing stolen property.  Tex. Penal Code

§ 31.02; see also 19 Tex. Jur. 3d Criminal Law: Offenses Against Property §§ 1, 2

("This theft offense is aptly described as general . . . because it results from a

legislative consolidation of many specific types of theft established under prior

20

law . . . ."). As a result, the statutory definition encompasses conduct that goes beyond the ordinary meaning of "unlawful taking" described above.

The statutory crime of theft arose out of the common law offense of larceny, which required a "trespassory taking and carrying away," and early statutory definitions of theft required that property be "taken fraudulently, without consent of the owner, with the intent to deprive the owner of its value." See Musick v. State, 51 S.W.2d 715, 716 (Tex. Crim. App. 1932); 3 Wharton's Criminal Law §§ 342, 382 (15th ed.); see also Bailey v. State, 18 Tex. Ct. App. 426, 431 (1885) (referring to the definition of larceny in discussing the pleading requirements in an indictment for statutory theft). The definition of "appropriate" within the definition of "theft" in Section 31.03 includes "to acquire or otherwise exercise control over property other than real property," Tex. Penal Code § 31.03(4)(B), which aptly reflects the ordinary definition of "taking" and the earlier definitions of "theft." Plaintiff, however, urges that the Court use the other included meaning of "appropriate": "to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another." See id. § 31.01(4)(A). The Court is mindful that it "must give the policy's words their plain meaning, without inserting additional provisions into the contract." Don's Bldg. Supply, Inc., 267 S.W.3d at 23. Plaintiff's suggested

statutory language is too far removed from the plain and ordinary meaning of "taking" to inform the Court as to the parties' intent under the insurance policy.

Plaintiff correctly argues that possession is not required to show a taking under Texas law, citing Stewart v. State, 44 S.W.3d 582, 588–89 (Tex. Crim. App. 2001). (Dkt. # 177 at 7–8.)  The Texas Court of Criminal Appeals there stated that "the gravamen of theft is in depriving the true owner of the use, benefit, enjoyment, or value of his property, without his consent" in holding that possession was not required to show theft.  Stewart, 44 S.W.3d at 588–89.  The court also made clear, however, that the reason theft had occurred in that instance was because the defendant "exercised control" over the property.[8]  Id.  Plaintiff has shown no evidence that Leavell exercised any control over the fuel it claims as lost property under the policy, or that Leavell's alleged misconduct deprived it of the use or value of the fuel.  While Leavell's misrepresentations may have led Plaintiff to continue selling the fuel to Enmex on credit despite its outstanding debt, his misrepresentations did not exert control over the fuel such that possession or control of the fuel was transferred by virtue of the misrepresentations themselves. Stated differently, Leavell's alleged forgeries did not transfer possession or control

_____

[8] In Stewart, the defendant exercised control over the subject property by causing the complainant to release the property by threat, even though he never took possession of the property.  44 S.W.3d at 589.  The Court of Criminal Appeals also gave the example of a shipping clerk who reroutes a package by substituting a new address label as an illustration of exercising control without taking possession.  Id. at 588.

of the fuel—the fuel was transferred only upon its subsequent sale by Plaintiff to Enmex.

The Court may also look to analogous decisions in other jurisdictions in determining how the Texas Supreme Court would interpret this language. See Norwood v. Raytheon Co., 414 F. Supp. 2d 659, 663 (W.D. Tex. 2006) (citing Hollis v. Hill, 232 F.3d 460, 469 (5th Cir. 2000)). The cases cited by Defendant are of limited assistance, as they do not include any substantial reasoning or explanation of the proper interpretation of "taking" and are distinguishable on their facts from the employee conduct at issue here. See Hartford Fire Ins. Co. v. Mitchell Co., Inc., 440 F. App'x 759, 760 (11th Cir. 2011) (non-precedential) (holding that an employee's self-dealing in employer's real estate transactions was not a taking); Williams Elec. Games, Inc. v. Barry, No. 97 C 3743, 2000 WL 106672, at *1 (N.D. Ill. Jan. 13, 2000) (ruling that an employee's bribery of a buyer, causing buyer to pay inflated prices for employer's goods, which employer subsequently was required reimburse, was not a taking). The facts of Pine Best Automotive, Inc. v. Royal Indemnity Co., No. 06-5995 (JAP), 2008 WL 4682582 (D.N.J. Oct. 21, 2008), are somewhat closer—in that case, an employee falsified credit applications, which induced a bank to issue loans to customers of the employer who did not meet the bank's credit standards. Id. at *3. The employer's claimed loss was the money required to reimburse the bank for its customer's

23

defaults on the bank's loans, which the court held was not a taking under the policy.  Id. at *6.  Here, however, Plaintiff's claimed loss is not reimbursement to a third party for its employee's malfeasance, but the fuel Plaintiff itself sold on credit based on Leavell's alleged misrepresentations.

The Court has found one other case in which a court has interpreted "unlawful taking" under similar facts.  In Morris Kirschman & Co., L.L.C. v. Hartford Fire Ins. Co., an employee manipulated her employer's accounts receivable to make delinquent accounts appear current, resulting in over five million dollars of accounts receivable becoming uncollectible.  No. Civ.A 03-1743, 2004 WL 1934848, at *1 (E.D. La. Aug. 30, 2004).  The employer's insurance policy covered employee theft, and defined "theft" as an "unlawful taking to the deprivation of the insured."  Id.  The court held that the employee's manipulation of the account was an unlawful taking, stating briefly that "theft is theft even if [the employee] did not personally take cash from [her employer's] bank accounts.  The policy definition of 'theft' requires 'deprivation of the insured,' which surely occurred in this case."  Id.

The Court does not find this reasoning persuasive.  While the policy's definition of "theft" requires "deprivation of the insured," it also requires an "unlawful taking."  (Policy ¶ F.20.)  While the Court agrees that an unlawful taking does not require that an actor personally take possession of another's property, the

24

actor must, at minimum, exert control over the property such that control or possession of the property is transferred from the owner to another.  Interpreting "theft" under the policy to be satisfied by any dishonesty that results in deprivation to the insured would read the language defining "theft" as an "unlawful taking" out of the policy, which the Court may not do.

The Court finds that Leavell's conduct, taking the evidence in the light most favorable to Plaintiff, does not amount to an "unlawful taking" under the plain and ordinary meaning of that term as governed by Texas law.  The loss of fuel claimed by Plaintiff is thus not covered under its policy covering loss of property resulting directly from theft committed by an employee, and Defendant is therefore entitled to judgment as a matter of law on Plaintiff's claims for declaratory relief and breach of contract.  For the same reasons, Plaintiff is not entitled to judgment as a matter of law on the issues of the proper interpretation of "theft" under the policy and whether Leavell's acts were covered under the policy.[9] The Court therefore **DENIES** Plaintiff's Motion for Partial Summary Judgment.

## II.     Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiff's Complaint includes a cause of action for breach of the implied covenant of good faith and fair dealing.  Defendant argues that it is entitled

---

[9] Because the above analysis is sufficient to resolve Plaintiff's contract claims, the Court does not reach the parties' arguments concerning the proper interpretation of "resulting directly from" under the policy.

to summary judgment on this claim because Plaintiff cannot show that Defendant knew or should have known there was no reasonable basis for denying Plaintiff's claim, and because Plaintiff cannot show extra-contractual damages.  (Dkt. # 153 at 1–2.)  Plaintiff responds that Defendant's liability for its claim was reasonably clear, that Defendant's investigation into its claim was pretextual and improper, and that it has pled extra-contractual damages in the form of attorneys' fees.  (Dkt. # 178 at 2–3.)

"An insurer has a duty to deal fairly and in good faith with its insured in the processing and payment of claims."  Republic Ins. Co. v. Stoker, 903 S.W.2d 338, 340 (Tex. 1995).  "[I]n most circumstances, an insured may not prevail on a bad faith claim without first showing that the insurer breached the contract."  Liberty Nat'l Fire Ins. Co. v. Akin, 927 S.W.2d 627, 629 (Tex. 1996).  It is possible, however, that in denying the claim, an insurer may commit some act "so extreme" that it would cause injury "independent of the policy claim."  Stoker, 903 S.W.2d at 341.  An insured further has a duty to timely investigate its insured's claims regardless of the final coverage determination.  Id.

An insurer is liable for breach of the duty of good faith and fair dealing "if the insurer knew or should have known that it was reasonably clear that the claim was covered."  Universe Life Ins. Co. v. Giles, 950 S.W.2d 48, 56 (Tex. 1997).  A bona fide coverage dispute, standing alone, cannot alone demonstrate

26

bad faith.  State Farm Fire & Cas. Co. v. Simmonds, 963 S.W.2d 42, 44 (Tex.

1998).  An insurer is not liable for an erroneous denial of a claim as long as a

reasonable basis for denial of the claim exists.  Republic Ins. Co., 903 S.W.2d at

340.

       As discussed at length above, Plaintiff has not shown that Defendant's

denial of its claim was a breach of contract, and the Court has determined that the

basis for Defendant's denial was not only reasonable, but correct.  Plaintiff's

breach of duty claim thus depends on showing that Defendant either failed to

timely investigate Plaintiff's claim or committed an act so extreme as to cause

injury independent of its policy claim.  See Stoker, 903 S.W.2d at 341.  Plaintiff

has shown neither.

       First, Plaintiff has not shown, and indeed does not argue, that

Defendant failed to timely investigate its claim.  Instead, Plaintiff argues that

Defendant engaged in a pretextual investigation "calculated to result in a denial of

coverage, and/or to secure [Defendant] a significant and unfair advantage in this

litigation."  (Dkt. # 178 at 2.)  An insured, however, cannot establish a claim for

bad faith without offering evidence that the insurer's liability on the claim had

become reasonably clear, or that there was no reasonable basis for denying the

claim.  Provident Am. Ins. Co. v. Castaneda, 988 S.W.2d 189, 198 (Tex. 1998).

The common-law tort of bad faith does not "include a mechanism by which a

factfinder could conclude that the denial was pretextual even though there was a reasonable basis for denying the claim." Id. Here, Defendant had a reasonable basis for denying Plaintiff's claim—namely, that Leavell's alleged falsification and forgery of documents indicating that the Enmex account was adequately collateralized was not "theft" as defined under the policy.

The faults Plaintiff finds in Defendant's investigation do not indicate that Defendant ignored information that would have shown that its liability under the policy was reasonably clear. Plaintiff first complains that Defendant refused to articulate the results of its investigation indicating that Leavell likely falsified the documents in question, and instead assumed, without expressly finding in its denial letter, that Leavell had falsified the documents. (Dkt. # 178 at 6.) Defendant's denial was not based on its assessment of Leavell's conduct, and its decision to assume rather than decide that Leavell falsified and forged the documents does not indicate that Defendant ignored information that would have rendered liability for the claim reasonably clear. Plaintiff next asserts that Defendant deliberately disregarded evidence related to the reliance of Plaintiff's auditors on the falsified documents. (Id. at 8.) This evidence, however, was unnecessary to Defendant's reasonable determination that Leavell's conduct was not "theft" as defined under the policy, and would not have changed its assessment of liability. Finally, Plaintiff claims that Defendant's investigation focused on topics it knew were

inapplicable to Plaintiff's claim.  (Id. at 13.)  This argument simply echoes Plaintiff's legal arguments concerning the proper interpretation of the policy, and does not show bad faith on the part of Defendant.

Second, Plaintiff has not identified any act by Defendant that has caused it injury beyond Defendant's denial of its policy claim.  Plaintiff has shown no additional injury other than the costs and attorneys' fees necessary to bring this suit, which cannot be recovered absent a showing of wrongful conduct by the opposing party.  Great Am. Ins. Co. v. AFS/IBEX Fin. Servs., Inc., 612 F.3d 800, 807 (5th Cir. 2010) (citing Arthur Andersen & Co. v. Perry Equip. Co., 945 S.W.2d 812, 816 (Tex. 1997)).  There is thus no genuine dispute of material fact, and Defendant is entitled to judgment as a matter of law on Plaintiff's claim for breach of duty of good faith and fair dealing.  The Court therefore **GRANTS** Defendant's Motion for Summary Judgment, and **DENIES AS MOOT** Defendant's Motion, in the Alternative, for Partial Summary Judgment.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment (Dkt. # 150), **GRANTS** Defendant's Motion for Summary Judgment (Dkt. # 151), and **DENIES AS MOOT** Defendant's Motion, in the Alternative, for Partial Summary Judgment (Dkt. # 153).

**IT IS SO ORDERED.**

**DATE:** April 7, 2015, San Antonio, Texas.

David Alan Ezra
Senior United States Distict Judge